IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:22-cv-235

**ALBERT S., and S.S.,** *a minor, by and through her parent, Albert S.,*

        Plaintiffs,

vs.

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, NORTH CAROLINA BAR ASSOCIATION HEALTH BENEFIT TRUST, and LAWYERS INSURANCE AGENCY, INC.,**

        Defendants.

## COMPLAINT

1. This is an action arising under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 et seq. ("ERISA"), to recover benefits due under an employee welfare benefit plan, for appropriate equitable relief, and to recover costs, attorneys' fees, and interest, and other relief as appropriate, as provided by ERISA.

PARTIES

2. Plaintiff, Albert S., is a citizen and resident of Asheville, Buncombe County, North Carolina. He is the parent and legal guardian of S.S.

3. Plaintiff, S.S., is a minor and is a citizen and resident of Asheville, Buncombe County, North Carolina.

4. Defendant North Carolina Bar Association Health Benefit Trust (hereafter, the "Plan") is a self-funded "employee welfare benefit plan" organized and existing pursuant to 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA")

and created by the North Carolina Bar Association for the benefit of its employees. It is subject to being sued as a separate entity pursuant to 29 U.S.C. §1132(d)(1).

5. Defendant Blue Cross and Blue Shield of North Carolina ("BSBSNC") is an independent licensee of the nationwide BlueCross and BlueShield network of providers and was the claims administrator for the Plan.

6. Defendant Lawyers Insurance Agency, Inc. is the plan administrator.

7. Upon information and belief, the Plan and/or Lawyers Insurance Agency, Inc. has delegated to BCBSNC the responsibility for administering the Plan, including the functions of reviewing claims and making claim coverage decisions such as whether to grant or deny benefits.

8. BCBSNC has a fiduciary obligation to beneficiaries under the Plan, including the Plaintiffs in this action, to administer the Plan fairly and impartially, for the exclusive benefit of participants and beneficiaries such as Plaintiffs, and to make benefit determinations according to the terms of the Plan.

9. Upon information and belief, the actions of BCBSNC, as alleged in this Complaint, were taken within the scope of its agency relationship with the Plan, so that its acts and omissions are imputed to the Plan.

10. The North Carolina Bar Association is the Plan Sponsor.

11. At all times relevant to this action, Plaintiffs have been covered participants and/or beneficiaries under the Plan.

## JURISDICTION AND VENUE

12. This Court has jurisdiction to hear this claim pursuant to 28 U.S.C. § 1331, in that the claim arises under the laws of the United States. Specifically, Plaintiffs bring this action

to enforce their rights under ERISA, as allowed by 29 U.S.C. § 1132(e)(1).

13. Venue in the Western District of North Carolina is appropriate because Plaintiffs reside in this district, because BCBSNC is a North Carolina nonprofit corporation licensed to do business in North Carolina, because the Plan has been administered in North Carolina, and because the Defendant Plan, the Defendant Claim Administrator, the Plan Sponsor, and the Defendant Plan Administrator each do substantial business in this district.

FACTUAL ALLEGATIONS

**A. Background.**

14. S.S. was born on June 2, 2006.

15. S.S. is a covered dependent under the terms of the Plan.

16. S.S. was identified as experiencing processing differences, inattention, and trouble with emotional regulation in kindergarten and as a result, underwent a psychoeducational evaluation, which revealed SS presented with superior intelligence but with highly distinctive characteristics associated with fine motor developmental delay, attention deficit disorder with hyperactivity and inattentive characteristics, and signs of dyslexia.

17. Based on these concerns, S.S. was enrolled in a specialized program for first grade and began receiving stimulant medication; however, the headmaster determined that the program was causing S.S. anxiety and that she should not continue.

18. S.S. attended a private school from second through fifth grade but struggled socially and became increasingly defiant and withdrew from the school at the conclusion of fifth grade.

19. S.S. was officially diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), anxiety, and dyslexia at age of 7.

20. From the age of 7 – 10-years-old, S.S. was treated with therapy, neurofeedback, and various stimulant medications.

21. S.S. was enrolled in a same-sex middle school, where she struggled socially, largely due to attachment issues in relationships, and with distraction, inattentiveness, and anxiousness.

22. S.S. began engaging in self-harm (cutting) in middle school, typically on areas that were easy to conceal, such as her legs, chest, arms, and ankles.

23. S.S. participated in individual therapy throughout middle school and thereafter began weekly dialectical behavioral therapy (DBT).

24. S.S. was diagnosed with probable personality disorder in early 2020 and was thereafter prescribed Lexapro, a selective serotonin reuptake inhibitor ("SSRI").

25. S.S. graduated from middle school in spring 2020.

26. In summer 2020, S.S.'s condition worsened to the point that she began gesturing suicide and had to be physically restrained to prevent her from harming herself.

27. S.S. was scheduled to enroll in virtual high school in fall 2020 due to the COVID-19 pandemic; however, due to safety concerns of leaving S.S. home alone, Plaintiff Albert S. enrolled S.S. in a private boarding school in August 2020 that provided a day program for local residents like Plaintiffs.

28. From August 19, 2020 – November 22, 2020, S.S. attended outpatient therapy at least once per week, sometimes more frequently, with therapist Melissa J. Villadoas, MS, LCMHCS, NCC.

29. Regarding S.S.'s self-harm urges, therapist Villadoas reported:

    *S.S. reported having a history of self-harm and suicidal ideation at the beginning of treatment which persisted and became more intense over the course of treatment.*

> *S.S.'s suicidal thoughts became more vocal threats in October and November, which gave reason for the recommendation for a higher level of care. At this time S.S. was also actively self-harming, which she tried to hide and then lied about when confronted. As S.S.'s self-harm and suicidal ideation intensified her engagement in treatment decreased. S.S.'s unwillingness to be forthcoming with her depressive symptoms of self-harm and suicidal ideation made her a high risk for harming herself.*

30. Due to continued struggles, S.S.'s provider prescribed Wellbutrin in addition to the Lexapro she was already taking.

31. While at the boarding school, S.S. continued to engage in self-harm and in October 2020, S.S. attempted suicide by overdose.

32. On November 11, 2020, S.S. presented to the boarding school's health center for a body assessment at which time the school nurse documented six total cuts on S.S.'s chest; S.S. thereafter admitted to cutting herself, but lied to her peers about the cuts, telling them that she had gone to a party, was drugged, sexually assaulted, and when she awoke, she had the scratches on her chest.

33. S.S. was asked to withdraw from the boarding school in November 2020 due to escalating struggles with peer relationships and attachment issues, as well as continued self-harming behavior.

34. Following her discharge from the boarding school, S.S. underwent a formal psychological evaluation with Carlyn Daubs, PhD, LP on November 16, 2020. During the evaluation, S.S. reported that she recently attempted suicide by drowning.

35. As a result of Dr. Daubs' evaluation, she concluded, in part:

> *S.S. had recently been asked to find alternate schooling options due to increased concerns about her emotional and behavioral functioning. The intention of this evaluation is to provide diagnostic clarification and develop treatment recommendations. S.S.'s care providers described difficulties related to interpersonal relationship problems, poor impulse control, emotional dysregulation, and manipulative behaviors. This evaluation was determined to be*

> *medically necessary in order to provide diagnostic clarification and develop treatment recommendations. Specifically, S.S.'s care providers indicated specific concerns regarding S.S.'s depression, impulsivity, manipulation, anxiety, interpersonal relationship problems, and adaptive dysfunction. Further, due to her symptom profile, testing was necessary to determine the appropriate diagnosis and create an applicable treatment plan. Specifically, home placement was becoming increasingly dangerous and residential treatment became necessary…*
>
> *S.S require[s] a higher level of care than what could be provided in a traditional outpatient setting. She was engaging in increasingly dangerous and risky behaviors that were demonstrating a heightened risk for harm to herself or others. Further, despite her parents' attempts at outpatient therapy, she was showing a decline in functioning and residential placement was determined to be necessary to prevent further deterioration and provide improvement in symptoms…*
>
> *S.S. is in a critical stage of development in which she requires therapeutic support and structured learning opportunities to prevent the development of more pathological psychological symptoms. It appears that S.S.'s current symptom presentation is related to the experiences she has endured and without long term residential services, these symptoms will inevitably develop into a more characterological presentation that would be much more difficult to remediate. Due to S.S.'s sophisticated manipulative tendencies, a residential placement is imperative to ensure that all authority figures present a united and supportive stance.*

36. Dr. Daubs also opined that S.S. "must be continually monitored regarding the severity of her suicidal thoughts and self-harm behaviors, and a safety plan must address possible concerns" and recommended that S.S. "transition into a residential treatment facility as soon as feasible." Dr. Daubs also opined that S.S.'s defiance of authority, confrontational tendencies, impulsivity, depressive symptoms, and emotional guardedness may form obstacles in developing necessary treatment progress.

37. S.S. was admitted to Blue Ridge Therapeutic Wilderness ("Blue Ridge") on November 29, 2020.

38. S.S.'s diagnoses upon admission to Blue Ridge were:

    a. Major Depressive Disorder, Recurrent Episode, Moderate;

    b. Generalized Anxiety Disorder;

    c. Adjustment Disorder;

    d. ADHD, Inattentive Presentation with Processing Speed Deficits; and

    e. Borderline Personality Traits

39. While at Blue Ridge, S.S. participated in twice weekly group therapy, weekly individual psychotherapy and family intervention, and various forms of daily therapy with Blue Ridge's trained wilderness staff.

40. S.S. completed the Blue Ridge program and was discharged on February 17, 2021.

41. At the time of discharge, S.S.'s Blue Ridge therapist, Christine Riley, recommended that S.S. be immediately transported from Blue Ridge to a residential placement:

> *I remain concerned regarding her risk for relapsing in the areas of conduct problems, social difficulties, depressive symptoms, anxiety, and substance abuse if she were to return to her home environment after completing our program.*
>
> *I believe that if any longterm gains are to be made, she must be in a residential or therapeutic boarding school setting after Blue Ridge so that she can practice and internalize the tools she learned at Blue Ridge. Returning to her home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to her previous level of functioning. S.S. remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies she has learned at Blue Ridge without a structured setting.*
>
> *Further, I would strongly recommend that she go directly from Blue Ridge to her next placement. Returning home, even for a few days, would place her at great risk for a regression in functioning and would undo much of the progress that she has made at Blue Ridge Therapeutic Wilderness.*

**B. Solacium Sunrise Residential Treatment Center.**

42. Defendants approved Solacium Sunrise Residential Treatment Center ("Sunrise") for S.S.'s in patient stay.

43. S.S. was admitted to Sunrise on February 18, 2021, after being transported directly from Blue Ridge to Sunrise.

44. Upon admission, S.S.'s "problem areas" were described as follows:

*Client Problem Area 1*

*SS has a history of anxiety and depression symptoms including a suicide attempt, history of self-harming, excessive worry, sleep disturbances, sadness, and self-deprecatory thoughts.*

*Client Problem Area 2*

*SS has struggled to regulate her emotions and has engaged in ineffective behaviors.*

*Client Problem Area 3*

*S.S. has struggled in relationships with her parents, peers and in romantic relationships.*

45. While at Sunrise, S.S. participated in group, family, and individual therapy sessions; S.S. was also routinely evaluated by a psychiatrist who adjusted S.S.'s medications as necessary.

**C. Defendants' Initial Denial.**

46. Three days prior to Defendants' issuance of its initial denial letter, S.S. reported homicidal feelings.

47. Approximately only two months after her admission to Sunrise, by letter dated April 14, 2021, BCBSNC unilaterally determined that S.S. no longer qualified for coverage to continue treatment at Sunrise, stating:

> *We are not able to approve coverage for your continued treatment in a child and adolescent residential behavioral health treatment as of 4/20/2021.*
>
> *Continued treatment in a behavioral health residential care facility for children/adolescents is only covered when certain conditions are met:*
> *-You are at high risk for harming yourself or other people.*
> *-Residential care is needed to meet your needs.*
> *-Your condition is likely to improve with residential care and get worse without this care.*
> *-Treatment at different level of care (such as a group home, day program, intensive outpatient program or outpatient care) is not available or good*

*enough.*

*Your available health records show that you can be treated effectively outside of a residential facility. You have made some progress in this residential treatment facility where you have been since February 2021. Your health records show that you do not have immediate risk of harm to yourself or others. There is no information to show that a different level care is not appropriate to help you (such as day program, intensive outpatient therapy, and medication management).*

48. As a result, Defendants denied any further coverage beyond April 20, 2021 for S.S.'s continued in-patient stay at Sunrise.

**D. S.S.'s Continued In-Patient Treatment at Sunrise.**

49. In spite of the denial by Defendants, Albert S. made the decision to keep S.S. admitted at Sunrise because the alternative of discharging her would put her health, and indeed, her life, in serious jeopardy.

50. To do so, Albert S. paid for S.S.'s inpatient stay at Sunrise out-of-pocket at a rate of $460.00 per day.

51. Although the controlled environment at Sunrise largely prevented her from acting on her urges, S.S. reported suicidal thoughts that included jumping out of the window, collecting pills and overdosing, and drinking chemicals; however, that same day, S.S. managed to engage in self-harm by repeatedly hitting her head against a wall.

52. During the months following Defendants' denial, S.S.'s treatment slowly progressed, and her condition gradually began to improve.

**E. S.S.'s First Appeal.**

53. Plaintiffs appealed the initial denial of S.S.'s claim on October 7, 2021, discussing, among other things, flaws found in BCBSNC's analysis of the Magellan Care Guidelines ("MCG") Level of Care Guidelines, S.S.'s past and current behavior, S.S.'s treatment

history, S.S.'s treating providers' positions on the medical necessity of S.S.'s continued inpatient stay, Sunrise's clinical notes, as well as other relevant factors.

54. BCBSNC denied Plaintiffs' appeal by letter dated November 5, 2021, stating:

> *Review of your child's medical records did not indicate ongoing acute safety concerns that would have necessitated 24 hours a day, 7 days a week mental health treatment from April 20, 2021 onwards. Your child was able to go off campus, including overnights, and did well further indicating that the residential facility treatment team did not feel that they were unsafe or that they required 24 hour monitoring and restriction to the facility. There were no significant psychotic symptoms. There was no evidence of self-harm or harm to others. Your child was capable of doing activities of daily living (ADLs) and was medically stable and tolerated the medications prescribed. No behavioral health conditions were documented that required continued residential care for the purpose of monitoring any drug withdrawal symptoms or medical conditions that required close monitoring. As a result, your child's treatment did not require the intensity of residential mental health services from April 20, 2021 forward, but instead would have been more appropriate for continuation of treatment in a less restrictive setting. Criteria for coverage are not met and continued coverage of a residential treatment center admission on and after April 20, 2021 is denied.*

55. BCBSNC's November 5, 2021 denial constituted exhaustion of the Plan's internal appeal process.

**F. S.S.'s Second Appeal.**

56. Having exhausted the Plan's mandatory appeals procedure, Plaintiffs filed a voluntary second level appeal on or around June 8, 2022.

57. BCBSNC held a level two appeal panel meeting on August 1, 2022.

58. Albert S. and his legal representative participated in the meeting and discussed, among other things, clinical evidence that established residential treatment for S.S. continued to be "medically necessary" on and after April 20, 2021, which included, but was not limited to:

   a. S.S.'s continued and often daily suicidal urges as documented in Sunrise's

records;

b. S.S.'s continued and often daily self-harm urges as documented in Sunrise's records;

c. S.S. being placed on "safety" numerous times by Sunrise staff for incidents including, but not limited to, on multiple occasions S.S. was found banging her head against the wall, S.S. punched a hole in the wall and had to be physically restrained, and S.S. created an unsafe environment for peer by providing access to the peer's self-harm tool of choice.

59. Only one day after the appeal panel meeting, by letter dated August 2, 2022, BCBSNC denied Plaintiffs' second level appeal.

60. BCBSNC's second level appeal denial was based upon the report of an unidentified "external Medical Specialist" who found that S.S. did not meet the MCG Health Behavioral Health Care Residential Behavioral Health Level of Care guidelines for medical necessity.

61. In making this finding, the "external Medical Specialist" opined that "there was no indication of the patient had any active suicidal thoughts with plans or intent. There was no indication of the patient had engaged in any self-injurious behaviors. There was no indication of the patient continued to be at high risk of harm to herself or others."

62. The "external Medical Specialist" did acknowledge that "The patient was reported to have intermittent suicidal thoughts and urges to engage in self-harm throughout her stay at the residential treatment which was noted to be her baseline."

63. BCBSNC's August 2, 2022 Level II denial constituted a final internal adverse benefit determination under the terms of the Plan.

**G. S.S.'s Discharge from Sunrise.**

64. On March 15, 2022, Plaintiff Albert S. made the decision to discharge S.S. from Sunrise.

65. S.S. is far healthier today than she had been her entire adolescent life before her treatment at Sunrise.

66. Despite the overwhelming evidence of medical necessity, Defendants have failed and refused to honor their contractual obligations to provide coverage for S.S.'s in-patient stay at Sunrise.

67. Plaintiffs have now exhausted their administrative remedies, and their claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

FIRST CLAIM FOR RELIEF:
WRONGFUL DENIAL OF BENEFITS
UNDER ERISA, 29 U.S.C. § 1132

68. Pursuant to FED. R. CIV. P. Rule 10(c), Plaintiffs respectfully incorporate by reference all prior paragraphs as if set forth fully and re-alleged.

69. Defendants have wrongfully denied healthcare benefits to Plaintiffs in violation of the Plan provisions and ERISA for the following reasons:

    a. The Plan language allows coverage for the treatment;

    b. The inpatient stay at Sunrise was prescribed by S.S.'s medical providers and is reasonable and necessary to address her medical conditions;

    c. Under the terms of the Plan, Plaintiffs are entitled to the health benefits, as inpatient treatment for S.S. was medically necessary;

    d. Defendants failed to accord proper weight to the opinion of S.S.'s medical providers who know her and are familiar with her conditions;

    e. Defendants failed to accord proper weight to the evidence in the administrative

record showing S.S.'s treatment was medically necessary and covered by the terms of the Plan;

f. Defendants' interpretation of the definition of "medically necessary"/ "medical necessity" is contrary to and exceeds the permissible scope of the provisions of ERISA, and is unreasonable;

g. Defendants' interpretation of and reliance upon the MCG Health Behavioral Health Care Residential Behavioral Health Level of Care guidelines is unreasonable;

h. Defendants have abused their discretion, if any discretion exists, in denying coverage;

i. Defendants have violated their contractual obligation to furnish health insurance benefits to Plaintiff and his dependent; and

j. Plaintiffs have been treated differently from similarly situated participants and beneficiaries.

70. As a result of the conduct of Defendants, Plaintiffs have suffered significant damages, including medical expenses, attorneys' fees, and costs.

SECOND CLAIM FOR RELIEF:
VIOLATION OF MHPAEA
UNDER 29 U.S.C. § 1132(a)(3)

71. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSNC's fiduciary duties.

72. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for

treatment of medical/surgical disorders.

73. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

74. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

75. The medical necessity criteria used by BCBSNC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

76. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

77. When BCBSNC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms

of the Plan based on generally accepted standards of medical practice.

78. BCBSNC and the Plan evaluated S.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

79. The actions of BCBSNC and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders violate MHPAEA because BCBSNC and the Plan do not impose limitations, conditions, or restrictions that do not align with medically necessary standards of care for treatment of analogous medical and surgical treatment.

80. In addition, BCBSNC and the Plan violated MHPAEA by intentionally applying the MCG criteria in order to impose acute severity of illness requirements on subacute or intermediate behavioral health treatment, whereas the Plan and BCBSNC do not require patients to exhibit acute medical symptoms in order to qualify for treatment in an intermediate medical facility.

81. Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSNC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

82. The violations of MHPAEA by Defendants are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29

U.S.C. §1132(a)(3) including, but not limited to:

   a. A declaration that the actions of the Defendants violate MHPAEA;

   b. An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   c. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   d. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

   e. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

   f. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

   g. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

   h. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

83. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, Plaintiffs pray that the Court:

1. Grant declaratory and injunctive relief, finding that Plaintiffs are entitled to coverage for S.S.'s entire in-patient stay at Sunrise and other associated health benefits under

the terms of the Plan, and that Defendants be ordered to pay the benefits owed;

2. Grant Plaintiffs a declaratory judgment finding that S.S.'s in-patient stay at Sunrise is medically necessary and therefore a covered condition under the terms of the Plan;

3. Grant Plaintiffs injunctive or other appropriate equitable relief, finding that they are entitled to healthcare benefits to remedy the breach of fiduciary duty;

4. Enter an Order clarifying Plaintiffs' rights to future benefits under the Plan with respect to benefits for S.S.'s treatment, including follow-up care related to treatment;

5. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Claim for Relief;

6. Enter an Order awarding Plaintiffs all reasonable attorney fees, including costs and expenses incurred as a result of Defendants' wrongful conduct in denying coverage and failing to follow the Plan and ERISA pursuant to 29 U.S.C. § 1132(g) or as otherwise provided by law; and

7. Enter an award for such other relief as may be just and appropriate.

Dated this the 4th day of November, 2022.

/s/Caitlin H. Walton
CAITLIN H. WALTON
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, NC 28203-4727
Phone: 704/377-4300
Facsimile: 704/372-1357
E-mail: cwalton@essexrichards.com
N.C. State Bar No. 49246
*Attorney for Plaintiffs*